IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LESLIE ANN WILKIE PELTIER, et al., | ) | |
| | ) | Case No.: 1:20-cv-03775-TFH |
| Plaintiffs, | ) | Senior Judge Thomas F. Hogan |
| | ) | |
| v. | ) | Electronically filed on June 3, 2021 |
| | ) | |
| DEBRA HAALAND, | ) | |
| SECRETARY OF THE INTERIOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION FOR 1) FINAL CERTIFICATION OF PLAINTIFF CLASS
PURSUANT TO FED. R. CIV. P. 23(b)(3) FOR SETTLEMENT PURPOSES ONLY, AND
2) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT**

MELODY L. MCCOY
CO Bar # 16960, U.S. Dist. Ct. (D.C.) CO0043
KIM JEROME GOTTSCHALK, *pro hac vice*
NM Bar # 3799
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
Tel.: (720) 647-9691 (McCoy)
Tel.: (720) 647-9252 (Gottschalk)
Fax: (303) 443-7776
E-mail: mmccoy@narf.org
Email: jeronimo@narf.org

ATTORNEYS FOR PLAINTIFFS

## TABLE OF CONTENTS

I.   FACTUAL AND PROCEDURAL BACKGROUND…………………………………1

   A.  The Nature of the Lawsuit………………………………………………………....1

   B.  The Pembina Judgment Funds Awards……………………………………..……1

   C.  The Pending CFC Companion Case Relating to this Action…………………………4

   D.  The Tribal Plaintiffs' Settlement Agreement in the CFC Companion Case and the
      Class Action Settlement Agreement in this Action…………………………….…5

   E.  Summary of Key Class Action Settlement Agreement Terms…………………….…7

   F.  Notice to the Settlement Class and Reaction of the Class……………………...……8

      1.  CEG's Database……………………………………………………...……8

      2.  The Dedicated Telephone Line, Website, and Email Address………………..….9

      3.  The Notice Mailings………………………………………………………...11

         a.  The Initial Notice Mailing to Living OIBs and Notice and Claim Form
           Mailing to Potential Legal Representatives and Potential Heirs…...……11
         b.  The Secondary Notice and Claim Form Mailing to Potential Legal
           Representatives and Potential Heirs………………………………………13

      4.  Media Notice……………………………………………………..………15

      5.  Exclusions and Objections……………...……………………………………18

      6.  Claim
         Forms……………………………………………………………...............18

   G.  Proposed Final Allocation and Anticipated Distribution of Settlement
      Proceeds…………………………………………………………………....19

II.  FINAL CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS IS
    APPROPRIATE………………………………………………………….…23

   A.  Rule 23(a)and 23(b) Certification Standards Remain Satisfied……………….……23

   B.  Rule 23(c)(2) and Due Process Notice Requirements Have Been Satisfied………......24

**III.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT AGREEMENT…………………………………….....................................27**

**A. The Standard for Final Approval Has Five Factors…………………………………27**

**B. The Factors Are Met Here…………………………………………………………..28**

**1.   The Settlement is the Result of Arm's-Length Negotiations…………………....28**

**2. The Settlement Terms Are Favorable in Relation to the Strength of the Case…..31**

**3. The Settlement Was Reached at an Appropriate Stage of Litigation Proceedings…………………………………………………………………………...35**

**4. The Settlement Class Reaction to the Settlement is Favorable……………....……36**
**5. The Opinion of Class Counsel is that the Settlement is Fair, Adequate and Reasonable……………………………………………………………………………40**

**C. Class Counsel's Fees, Expenses, and Costs, and the Class Representative Service Awards Requests Are Reasonable……………………………………………………..40**

**IV.   CONCLUSION……………………………………………………………………42**

**EHXIBIT A   CLASS ACTION SETTLEMENT AGREEMENT**

**EXHIBIT B   AFFIDAVIT OF ANYA VERKHOVSKAYA REGARDING NOTICE EFFECTUATION**

**EXHIBIT C   OBJECTIONS RECEIVED TO DATE AND CEG RESPONSE TO THE SAME**

**EXHIBIT D   CLASS COUNSEL ATTORNEYS FEES AND CASE COSTS THROUGH APRIL 2021 FOR THIS ACTION AND THE CFC COMPANION CASE**

**EXHIBIT E   LIST OF ALL PRESENT AND PAST CLASS AND NAMED REPRESENTATIVES FOR INDIVIDUAL PLAINTIFFS IN THIS ACTION AND IN THE CFC COMPANION CASE**

**EXHIBIT F   DECLARATION OF MELODY L. MCCOY**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES, DECISIONS AND ORDERS

*Abraha v. Colonial Parking, Inc.*,
No. CV 16-680 (CKK), 2020 WL 4432250 (D.D.C. July 31, 2020)................................28, 34, 40

*Alvarez v. Keystone Plus Constr. Corp.*,
303 F.R.D. 152 (D.D.C. 2014)................................................................................31, 33, 34, 41

*Ceccone v. Equifax Info. Servs. LLC*,
No. 13-CV-1314 KBJ, 2016 WL 5107202 (D.D.C. Aug. 29, 2016) ..........................33, 34, 36, 37

*Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*,
69 Fed. Cl. 639 (2006) ................................................................................................................2

*Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States,*
73 Fed. Cl. 154 (2006) ................................................................................................................2

*Chippewa Cree Tribe, et al. v. United States*,
 (Fed. Cl. Filed Sept. 30, 1992) (No. 92-675 L) ................................................................ *passim*

*Cobell sub nom. Maulson, et al. v. Haaland*,
et al., No. 96-1285 (D.D.C.) .................................................................................................

*Cobell v. Norton*,
407 F. Supp. 2d 140 (D.D.C. 2005).........................................................................................29

*Cobell v. Salazar*,
No. 1:96CV01285 TFH, 2011 WL 10676927 (D.D.C. July 27, 2011),
*aff'd*, 679 F.3d 909 (D.C. Cir. 2012).......................................................................................32

*Cohen v. Chilcott*,
522 F. Supp. 2d 105 (D.D.C. 2007) ........................................................................................40

*Confederated Tribes of the Colville Reservation v. Salazar*,
(D.D.C. filed Apr. 11, 2012) (ECF No. 59) (No. 05-2471) .........................................................32

*Covelo Indian Cmty. v. Watt*,
551 F. Supp. 366 (D.D.C. 1982), *aff'd as modified*, (Dec. 21, 1982), *and
vacated as moot*, No. 83-2377 (D.C. Cir. Feb. 1, 1983)..............................................................29

*Equal Rts. Ctr. v. Washington Metro. Area Transit Auth.*,
573 F. Supp. 2d 205 (D.D.C. 2008) ..............................................................................27, 28, 41

*Freeport Partners, L.L.C. v. Allbritton*,
No. CIV.A. 04-2030 (GK), 2006 WL 627140 (D.D.C. Mar. 13, 2006) .........................................39

*Greenberg v. Colvin*,
No. 13-1837 (RMC), 2015 WL 4078042 (D.D.C. July 1, 2015) ......................................31, 33, 34

*Hartman v. Duffey*,
19 F.3d 1459 (D.C. Cir. 1994) ..............................................................................................23

*Howard v. Liquidity Servs. Inc.*,
No. CV 14-1183 (BAH), 2018 WL 4853898 (D.D.C. Oct. 5, 2018)......................................33, 35

*In re APA Assessment Fee Litig.*,
311 F.R.D. 8 (D.D.C. 2015)........................................................................................... *passim*

*In re Domestic Airline Travel Antitrust Litig.*,
322 F. Supp. 3d 64 (D.D.C. 2018) .......................................................................................25

*In re Domestic Airline Travel Antitrust Litig.*,
378 F. Supp. 3d 10 (D.D.C. 2019), *appeal dismissed*,
No. 19-7058, 2019 WL 3955818 (D.C. Cir. July 30, 2019) .............................................27, 36, 39

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
4 F. Supp. 3d 94 (D.D.C. 2013), *appeal dismissed*,
No. 14-7007, 2014 WL 1378762 (D.C. Cir. Apr. 3, 2014)....................................................37, 38

*In re Lorazepam & Clorazepate Antitrust Litig.*,
205 F.R.D. 369 (D.D.C. 2002)........................................................................................30, 38, 40

*Kinard v. E. Capitol Family Rental, L.P.*,
331 F.R.D. 206 (D.D.C. 2019).........................................................................................36, 42

*Little v. Washington Metro. Area Transit Auth.*,
313 F. Supp. 3d 27 (D.D.C. 2018), *appeal dismissed*,
No. 18-7071, 2018 WL 4600770 (D.C. Cir. Sept. 11, 2018)..................................................28, 39

*Nez Perce Tribe, et al. v. Jewell, et al.*,
(D.D.C. filed Dec. 28, 2006)................................................................................................29

*Prince v. Aramark Corp.*,
257 F. Supp. 3d 20 (D.D.C. 2017) ......................................................................................24

*Radosti v. Envision EMI, LLC*,
717 F. Supp. 2d 37 (D.D.C. 2010) .................................................................................33, 34, 39

*Red Lake, Pembina & White Earth Bands v. United States*,
164 Ct. Cl. 389 (1964) ...........................................................................................1

*Richardson v. L'Oreal USA, Inc.*,
991 F. Supp. 2d 181 (D.D.C. 2013) ......................................................................27

*Rogers v. Lumina Solar, Inc.*,
No. 18-CV-2128 (KBJ), 2020 WL 3402360 (D.D.C. June 19, 2020) .................. *passim*

*Ross v. Lockheed Martin Corp.*,
267 F. Supp. 3d 174 (D.D.C. 2017) ......................................................................28

*Sisseton Wahpeton Oyate, et al v. Jewell, et al.*,
(D.D.C. filed Apr. 30, 2013) .................................................................................29

*Stephens v. Farmers Rest. Grp.*,
No. CV 17-1087 (TJK), 2019 WL 2550674 (D.D.C. June 20, 2019)................23, 27

*Stephens v. US Airways Grp., Inc.*,
102 F. Supp. 3d 222 (D.D.C. 2015) ......................................................................34

*Trombley v. Nat'l City Bank*,
759 F. Supp. 2d 20 (D.D.C. 2011) ........................................................................32

*Trombley v. Nat'l City Bank*,
826 F. Supp. 2d 179 (D.D.C. 2011),
*appeal dismissed*, No. 12-7001, 2012 WL 556319 (D.C. Cir. Feb. 13, 2012) .......38, 39

*Turtle Mountain Band of Chippewa Indians v. United States*,
490 F.2d 935 (Ct. Cl. 1974) ...................................................................................2

*Turtle Mountain Band of Chippewa Indians v. United States*,
230 Ct. Cl. 1062 (1982) ..........................................................................................2

*Vista Healthplan, Inc. v. Warner Holdings Co. III*,
246 F.R.D. 349 (D.D.C. 2007)..............................................................................39

## TREATIES AND STATUTES

Treaty of October 2, 1863, 13 Stat. 667.......................................................................1

Treaty of October 12, 1864, 13 Stat. 689....................................................................1

25 U.S.C. §§ 1401-1408 ..............................................................................................3

28 U.S.C. § 1491 .................................................................................................................4

28 U.S.C. § 1505 .................................................................................................................4

Pub. L. No. 92-59, 85 Stat. 158 (1971),
formerly codified at 25 U.S.C. §§ 1241-1248 (1971 Distribution Act)..........................2

Pub. L. No. 97-403, 96 Stat. 2022 (1982).........................................................................3

Lieu Lands Act of April 21, 1904, 33 Stat. 189...............................................................2

## COURT RULES

Fed. R. Civ. P. 23 ...................................................................................................... *passim*

\* Cases or authorities on which counsel chiefly relies.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Nature of the Lawsuit

This action alleges breaches of trust by Defendants as trustees of two Judgment Awards of the Indian Claims Commission (ICC) made to the Pembina Band of Chippewa Indians ("Pembina Band" or "Pembinas"). First Amended Complaint (FAC) at ¶1 (ECF No. 11). The first Judgment Award ("the 1964 Award") and the second ("the 1980 Award") are known commonly and collectively as the "Pembina Judgment Fund" (PJF). *Id.* Plaintiffs are the 39,003 individual beneficiaries of the PJF ("Individual Plaintiffs"), as determined by Defendant the U.S. Department of the Interior ("Interior"), or the heirs, descendants, or successors-in-interest of those individuals who are deceased. *Id.* at ¶s 1 and 20. For Defendants' alleged failure to account for and mismanagement of the PJF, Individual Plaintiffs seek declaratory relief and money damages in amounts less than $10,000 per each Individual Plaintiff. *Id.* at ¶s 9, 10, and 20-22.

### B.  The Pembina Judgement Fund Awards

The 1964 Award was additional compensation for lands ceded by the Treaty of October 2, 1863, 13 Stat. 667, as modified by the Treaty of October 12, 1864, 13 Stat. 689.  The Pembinas' portion of the 1964 Award was $277,642.72.  *Red Lake, Pembina & White Earth Bands v. United States,* 164 Ct. Cl. 389, 399 (1964). Distribution of the 1964 Award was apportioned among four beneficiaries determined by the ICC, for purposes of the 1964 Award, to be the modern-day successors to the historic Pembina Band:  1) the White Earth Band of the Minnesota Chippewa Tribe ("White Earth Band"); 2) the Turtle Mountain Band of Chippewa Indians ("Turtle Mountain Band"); 3) the Chippewa Cree Indians of the Rocky Boy's Reservation ("Chippewa Cree Tribe"); and 4) as a group, individuals called Non-Member Lineal Descendants (NMLDs), who were determined by Interior to be lineal descendants of the

Pembina Band eligible to share in the 1964 Award, but who were not members of any of the 1964 Award Tribal beneficiaries.  Pub. L. No. 92-59 § 5, 85 Stat. 158 (1971) ("1971 Distribution Act:). Among the four beneficiaries, distribution was allocated based on the number of each beneficiary's individual members determined by Interior, pursuant to the 1971 Distribution Act and its implementing regulations, to be eligible to share in the 1964 Award. *Id*. Interior was to distribute one hundred percent (100%) of the 1964 Award as per capita payments to the beneficiaries' eligible individual members. *Id*. at §§ 4, 5.

Interior ultimately determined that 21,268 individuals were eligible to share in the 1964 Award. FAC at ¶s 102-104. Interior began the 1964 Award's distribution in October 1984.  *Id.; see also Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States,* 69 Fed. Cl. 639, 645 (2006). Until the distribution began, Defendants held the 1964 Award in a single trust account and in common for the 1964 Award beneficiaries. *Chippewa Cree Tribe,* 69 Fed. Cl. at 666-667; *accord Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States,* 73 Fed. Cl. 154, 162 (2006).

The 1980 Award compensated the Pembinas for a separate ICC claim for lands ceded under an October 1892 Agreement with the United States approved by Congress, with amendments, under the Lieu Lands Act of April 21, 1904, 33 Stat. 189, 193; *see also Turtle Mountain Band of Chippewa Indians,* 490 F.2d 935, 938 (Ct. Cl. 1974). The total amount of the 1980 Award to the Pembinas was approximately $52 million.  *Turtle Mountain Band of Chippewa Indians v. United States,* 230 Ct. Cl. 1062 (1982).

The 1980 Award was apportioned among five beneficiaries determined by the ICC, for purposes of the 1980 Award, to be the Pembina Band's modern-day successors:  1) the Turtle Mountain Band; 2) the Chippewa Cree Tribe; 3) the White Earth Band; 4) the Little Shell Tribe

of Chippewa Indians of Montana ("Little Shell Tribe"; and 5) as a group, NMLDs determined by Interior to be lineal descendants of the Pembina Band eligible to share in the 1980 Award, but who were not members of any of the 1980 Award Tribal beneficiaries. Pub. L. No. 97-403 § 2, 96 Stat. 2022 (1982) ("1982 Distribution Act"). Among the five beneficiaries, allocation was based on the number of each beneficiary's individual members determined by Interior, pursuant to the 1982 Distribution Act and its implementing regulations, to be eligible to share in the 1980 Award. *Id.*

In accordance with the Indian Tribal Judgment Funds Use and Distribution Act of 1973, 25 U.S.C. §§ 1401-1408, the 1982 Distribution Act provided generally that Interior distribute, in the form of per capita payments, eighty per cent (80%) of the four Tribal beneficiaries' shares of the 1980 Award to each beneficiary's eligible individual members. Pub. L. No. 97-403, §§ 3-6. Principals of twenty per cent (20%) of the four Tribal beneficiaries' shares would remain or provisionally remain held in trust by Defendants for each of the Tribal beneficiaries, with earnings on the principals available to the Tribal beneficiaries for tribal programs approved by Interior. *Id*. One hundred percent (100%) of the NMLD group's share would be distributed by Interior as per capita payments to the NMLD group's eligible individual members. *Id*. at § 7(c).

Interior ultimately determined that 33,584 individuals were eligible to share in the 1980 Award. FAC at ¶ 117. Interior began a partial per capita distribution of the 1980 Award in May 1988, and a final per capita distribution in 1994. *Chippewa Cree Tribe,* 69 Fed. Cl. at 645-46. Until the distributions began, Defendants held the 1980 Award in a single trust account and in common for the 1980 Award beneficiaries, and "all 1980 Award funds were treated alike in terms of investment and accounting." *Id*. at 667; *accord Chippewa Cree Tribe,* 73 Fed. Cl. at 162.

3

**C.  The Pending CFC Companion Case Relating to this Action**

In 1992 the PJF Tribal beneficiaries filed an action in the U.S. Court of Federal Claims, *Chippewa Cree Tribe, et al. v. United States,* (Fed. Cl. Filed Sept. 30, 1992) (No. 92-675 L) ("CFC Companion Case"), "on their own behalf, on behalf of their respective members, and on behalf of all [PJF] beneficiaries," seeking, *inter alia,* "money damages for the alleged mismanagement of [the PJF]." *Chippewa Cree Tribe,* 69 Fed. Cl. at 640. A Second Amended Complaint filed in 2004 named 34 individuals as Named Plaintiffs for PJF Individual beneficiaries, and was followed by a Motion for Class Certification seeking, *inter alia,* an Order approving these individuals as Class Representatives. *Chippewa Cree Tribe,* (Fed. Cl.  filed Sept. 3, 2004) (ECF Nos. 177-179).

In 2006 the Court:  1) denied the United States' motion to dismiss the action in whole or in part on statute of limitations grounds, *Chippewa Cree Tribe,* 69 Fed. Cl. at 662-65; 2) granted Plaintiffs' motion for summary judgment (and denied Defendant's cross motion for partial summary judgment) on the issue of the existence of "a statutory duty the violation of which may be fairly interpreted as mandating a right of recovery in damages" under the Tucker Act, 28 U.S.C. § 1491, *Chippewa Cree Tribe,* 69 Fed. Cl. at 641-662; and 3) denied Plaintiffs' motion for class certification. While the Court acknowledged that Plaintiffs met the basic criteria for RCFC 23 class certification and that under RCFC 12(b)(1) "the United States has acted or refused to act on grounds generally applicable to the class," the Court nevertheless was of the view that recognizing the Plaintiffs as an Identifiable Group under 28 U.S.C.  § 1505 was a

method superior to a class action "for the fair and efficient adjudication of the controversy." *Chippewa Cree Tribe,* 69 Fed. Cl. at 668-674.[1]

The Court defined the Section 1505 Identifiable Group as follows: "The group of beneficiaries of the 1964 and 1980 Awards, as defined in the 1971 and 1982 Distribution Acts, including their heirs, descendants, and successors-in-interest." *Chippewa Cree Tribe,* 69 Fed. Cl. at 673. The individuals set forth as Named Plaintiffs in the Second Amended Complaint were approved as Named Representatives for the Individual beneficiaries in the Identifiable Group. *Id.* at 674 ("Plaintiffs Renewed Motion for Class Certification is MOOT except to the extent that the Court DEEMS the motion to be a motion to permit participation in the case by the thirty-four named plaintiffs identified in the motion as a part of the plaintiff group.  The deemed motion to permit participation is allowed."). The Native American Rights Fund (NARF) was appointed as counsel for the Identifiable Group. *Chippewa Cree Tribe,* 69 Fed. Cl. at 668-674.

### D. The Tribal Plaintiffs' Settlement Agreement in the CFC Companion Case and the Class Action Settlement Agreement in this Action

Following the 2006 CFC Companion Case decisions, *Chippewa Cree Tribe,* (Fed. Cl. filed Jan. 26, 2006 (Dkt. #247); (Fed. Cl. filed Sept. 27, 2006) (ECF No. 264), the parties proceeded to attempt to resolve Plaintiffs' claims in the CFC's Alternative Dispute Resolution (ADR) program without the need for further litigation. *See Chippewa Cree Tribe,* (Fed. Cl. filed Feb. 24, 2009) (ECF No. 359) (Order referring all claims to the Court's ADR program and Senior Judge Eric G. Bruggink). After over a decade of settlement negotiations and discussions, in 2018 the parties reached a comprehensive settlement agreement in principle to collectively

---

[1] The Court expressly held that "[t]he rolls of eligible per capita beneficiaries prepared by the government for both the 1964 Award and the 1980 Award …meets (sic) the requirements of binding and persuasive precedent for a finding of the existence of an 'identifiable group' under 28 U.S.C. § 1505. *Chippewa Cree Tribe,* 69 Fed. Cl. at 671.

resolve and settle all of the claims of the Identifiable Group – including the claims of PJF Tribal beneficiaries and those of PJF Individual beneficiaries. *See Chippewa Cree Tribe,* ECF No. 505 (filed Feb. 1, 2019). The parties have approved and authorized the settlement. ECF No. 9 ("The complete settlement has been approved and authorized by not only all Plaintiffs (by tribal council resolutions executed by the four *Chippewa Cree* tribal plaintiffs and by affirmations executed by Individual Plaintiffs in this case and in *Chippewa Cree*) but also the United States"). The CFC Companion Case remains pending, and the claims of the four PJF Tribal beneficiaries will be settled in that forum pursuant to a Tribal Plaintiffs' Settlement Agreement executed by the Tribal beneficiaries and the United States.  FAC at ¶ 19.

However, counsel for the CFC Companion Case Identifiable Group are convinced, based on their review of the applicable laws and rules, especially those federal district court class action procedural rules governing requests by class members for exclusion from a settlement class ("opting-out"), that this Court provides the best forum and likelihood for the requisite fairness and finality relating to the final resolution of the claims of PJF Individual beneficiaries, through this Court's approval of the negotiated Class Action Settlement Agreement. *Id*. at ¶ 18; ECF No. 14, attached hereto as Exhibit A.

Accordingly, Individual Plaintiffs here are the 39,003 individuals (since some individuals were determined by Interior to be eligible to share in both the 1964 Award and the 1980 Award) determined by Interior to be PJF beneficiaries, or the heirs, descendants, and successors-in-interest of those Individual beneficiaries who are deceased. *Id*. at ¶ 20. This action is limited to claims regarding the PJF, and is limited to the common claims that the Individual Plaintiffs have as PJF Individual beneficiaries.  No claims of PJF Tribal beneficiaries are raised in this action. *Id*. at ¶ 21.

**E.   Summary of Key Class Action Settlement Agreement Terms**

The Settlement Class is defined as follows:   a) all Original Individual Beneficiaries ["("OIBs")], defined as: (i) the 21,268 individuals determined by Interior, pursuant to the 1971 Distribution Act and its implementing regulations, to be eligible to share in the 1964 Award; and, (ii) the 33,584 individuals determined by Interior, pursuant to the 1982 Distribution Act and its implementing regulations, to be eligible to share in the 1980 Award; b) all Legal Representatives of Settlement Class Members, defined as persons or entities selected by Settlement Class Members or appointed, retained or approved under applicable federal, state, or tribal law to represent the Settlement Class member, for purposes of any matter relating to this Class Action; c) all First-Line Heirs, defined as, in the absence of applicable federal, state or tribal law to the contrary, the living spouse, if any, of a deceased [OIB], and if there is no living spouse, the oldest living child of the deceased [OIB]; and d) all Second-Line Heirs, defined as, in those instances in which there are no First-Line Heirs, a next closest living heir of a deceased [OIB] as determined in accordance with applicable federal, state, or tribal law and as designated by the Settlement Administrator. Class Action Settlement Agreement, at § II.A.63, 45, 38, 34, and 58. The Settlement Agreement further provides that "Settlement Class Members" shall mean all Individual Plaintiffs in the Settlement Class who do not Exclude / Opt-out, as defined in the Settlement Agreement, of the Settlement Class.  *Id*. at § II.A.64 and 44.

The Class Action Settlement Agreement provides for a single payment by Defendants of Settlement Proceeds in the amount of $59 million for the claims of Settlement Class Members, the Tribal Plaintiffs' claims in the CFC Companion Case, Class Representative Service Awards, Class Counsel Fees, Expenses and Costs, and Settlement Administrator Fees, Expenses and Costs. *Id*. at §§ II.A.67 and II.K.2. The Settlement Agreement set forth a preliminary allocation

of the Settlement Proceeds, *id*. at § II.L, and the proposed final allocation of the Settlement Proceeds is set forth and discussed *infra*, in this Memorandum. The Settlement Agreement provisions for Notice to the Settlement Class, Exclusions / Opt-outs from the Settlement Class, and Objections to the Settlement Agreement, *id*. at §§ II.E, F, and H, also are discussed *infra*, as are the provisions for Settlement Proceeds Payment and Distribution, *id*. at §§ II.K and M.

Upon Final Approval of the Class Action Settlement Agreement by this Court, the primary waivers and releases of Settlement Class Members are any of their claims against Defendants for damages or equitable or specific relief based on harms or violations occurring before Final Approval of the Settlement Agreement related to Defendants' accounting and management of the PJF. *Id*. at § II.N.1. Once Defendants have transferred the Settlement Proceeds into the Escrow Account, Settlement Class Members also waive and release any claims against Defendants related to the allocation, distribution, administration, or use of the Settlement Proceeds by the Settlement Administrator, Individual Plaintiffs, and the Tribal Plaintiffs in the CFC Companion Case. *Id.* at § II.N.2.

**F.  Notice to the Settlement Class and Reaction of the Class**

The Settlement Agreement provisions for post-Preliminary Approval Notice to the Settlement Class and the Notice program were approved by this Court. Class Action Settlement Agreement at §§ II.A.40, 56, 68, 22, and 51 and II.E.4; Order at ¶s 6-8. Class Experts Group, LLC (CEG), is the court-appointed Settlement Administrator. Order at ¶ 8. CEG's required Affidavit of Notice and Mailing, Settlement Agreement at § II.I, is attached to this Memorandum as Exhibit B.  The Affidavit's details are summarized here.

**1.  CEG's Database**

To administer the settlement in this case, CEG created a secure, searchable, case-specific database ("Pembina Database"). Anya Verkhovskaya Aff. ("CEG Affidavit") at ¶ ___. From the OIB database created by Interior and provided to Plaintiffs during settlement negotiations in the CFC Companion case, *see Chippewa Cree Tribe*, Joint Status Report (Fed. Cl. filed Sept. 30, 2013) (ECF No. 459). *Chippewa Cree Tribe*, Joint Status Report (Fed. Cl. filed Apr. 16, 2014) (ECF No. 463); *Chippewa Cree Tribe*, Joint Status Report (Fed. Cl. filed June 29, 2018) (ECF No. 501), CEG uploaded the records of a total of 39,003 unique OIBs into the Pembina Database. CEG Affidavit at ¶ ___. CEG continually updates the Pembina Database records and information primarily from the following sources: the Tribal Plaintiffs in the CFC Companion Case; Interior; communications with Settlement Class Members, the United States Postal Service (USPS) and CEG's own research and procedures based on class action settlement industry standards. *Id*. at ¶s ___.

Fields and storage capabilities for records in the Pembina Database include, but are not limited to, the following: name; date of birth; date of death, where applicable; contact information; contact information updates; tribal affiliation, if any; PJF Award(s) received; date of Notice mailing; mail returned as "undeliverable as addressed"; telephone calls; emails; notes; payment mailing dates; payment clearance dates; payments returned as "undeliverable as addressed"; payment reissuance; scanned images of Claim Forms and Claim-related documentation and correspondence; Claim status; and other pertinent data. *Id*. at ¶s ___.

## 2. The Dedicated Telephone Line, Website, and Email Address

Immediately after Preliminary Approval, at Class Counsel's direction and supervision, CEG activated the Settlement Administration Information Telephone Line (1-833-999-9915) and

the Settlement Administration Information Website (www.PembinaSettlement.com) for this case, with a dedicated Email address, info@pembinasettlement.com. *See* ECF No. 27.

The Telephone Line is a toll-free number with an Interactive Voice Response (IVR) system, as well as a voicemail option and a live operator call back service. CEG Affidavit at ¶ ____. The IVR system answers calls and provides callers with a series of menu options to receive automated detailed information about the Settlement, as well as the option to request settlement-related documents and to update contact information. *Id*. at ¶ ____. Callers needing further assistance may leave a voicemail and receive a call back from a live agent. *Id*. at ¶ ____. The IVR menu options include:  how to file a Claim Form; requests for settlement-related documents including the Long-Form Notice and Claim Form; information regarding estimated Settlement Proceeds payments; important deadlines; and information regarding Class Counsel. *Id*. at ¶ ____.

As of the date of this filing, the IVR has received ___ voicemail messages which were returned by a live agent when required, making a total of ___ outgoing telephone calls by CEG. *Id*. at ¶ ____. The majority of voicemail inquiries relate to updated contact information for Settlement Class Members, requests for Claim Forms, and requests for assistance with completing and submitting Claim Forms. The remaining telephone inquiries typically relate to background information regarding this case and the CFC Companion Case.

The Website includes court documents such as the Complaint, the Settlement Agreement, and the Preliminary Approval Order, and the Long-Form and Summary Notices, *Id*. at ¶ ____.  It also includes information about Important Dates (including the Fairness Hearing), Frequently Asked Questions, and both a printable and electronically submittable Address Change form. *Id*. at ¶ ____.  The Website also is linked to the websites of Class Counsel and the four Tribal

Plaintiffs in the CFC Companion case, www.narf.org, www.chippewacree.org, www.tmchippewa.com, www.montanalittleshelltribe.org, and www.whiteearth.com. *See* ECF No. 27. As of the date of this filing, the Website has had a total of ___ visits resulting in ____ unique sessions *(i.e.,* time periods of website interaction or activity). CEG Affidavit at ¶ ____. Also as of the date of this filing, a total of ___ documents have been downloaded from the Website, which include ____ Settlement Agreements; ___ Long-Form Notices; and ___ Claim Forms. *Id*. at ¶ ____.

With respect to the dedicated Email address for this case, as of the date of this filing, CEG has received a total of 1,850 emails, and in response, CEG has sent 688 emails. *Id*. at ¶ ____. The majority of the emails relate to updated contact information for Settlement Class Members, and individuals requesting to update their contact information can do so via email. *Id*. at ¶ ____. Other inquiries include requests for settlement-related documents such as the Long-Form Notice and Claim Forms, requests for assistance with completing and submitting Claim Forms, and requests to receive a call back from a live agent. *Id*. at ¶ ____. At the request of incarcerated Settlement Class Members, working with digital messaging providers that partner with state correctional departments, CEG created a dedicated account to enable inmates to communicate with CEG via email. *Id*. at ¶ ____. Most inmate communications involve settlement term inquiries and requests for Claim Forms. *Id*. at ¶ ____.

3. **The Notice Mailings**

   a. **The Initial Notice Mailing to Living OIBs and Notice and Claim Form Mailing to Potential Legal Representatives and Potential Heirs**

On or about March 8, 2021, CEG began transmitting, by USPS regular first-class mail, postage prepaid, the Long-Form Notice, attached to CEG's Affidavit as Exhibit__, to living OIBs for whom CEG had contact information. *Id*. at ¶ ____. The initial mailing to the living

OIBs consisted of a total of 40,299 Long-Form Notices transmitted to 27,230 OIBs identified in the Pembina Database as living at the time of mailing.  *Id.* at ¶ ____.  The number of Long-Form Notices transmitted exceeded the number of living OIBs because, due to having multiple sources of addresses for OIBs, the Pembina Database had more than one address for many living OIBs, and CEG transmitted the Notices to all available addresses in the Pembina Database that it had for living OIBs.

Also on or about March 8, 2021, CEG transmitted, by USPS regular first-class mail, postage prepaid, the Long-Form Notice and Claim Form, attached to CEG's Affidavit as Exhibit__, to potential Legal Representatives of and potential Heirs to deceased OIBs by addressing the packages, "To the family of [deceased OIB's name]," care of the last known address of the deceased OIB. *Id.* at ¶ ____.  The initial mailing to potential Legal Representatives of and potential Heirs to deceased OIBs consisted of a total of 14,771 packages transmitted based on 11,376 OIBs identified in the Pembina Database as deceased at the time of mailing.  Again, the number of packages transmitted exceeded the number of deceased OIBs due to CEG having more than one last known address for some deceased OIBs. *Id.* at ¶ ____.  Thus, the total initial Notice mailing consisted of 55,070 packages (40,299 Long-Form Notices plus 14,771 Long-Form Notices and Claim Forms) to all known addresses of OIBs and potential Legal Representatives and potential Heirs.  *Id.* at ¶ ____.

Of the 55,070 packages transmitted in the initial mailing, as of the date of this filing, USPS has returned a total of 21,232 packages to CEG as "undeliverable as addressed". *Id.* at ¶ ____. These as "undeliverable as addressed" packages included packages transmitted to both living OIBs and last known addresses of deceased OIBs. *Id.* at ¶ ____.  CEG immediately reviews these returns, performs additional address research, and, if possible, re-mails the

packages, to any and all updated addresses, including forwarding addresses provided by USPS. *Id*. at ¶ _____. As of the date of this filing, CEG has re-mailed a total of 1,105 of the returned packages, of which 359 were Long-Form Notices mailed to 359 living OIBs, and 746 were Long-Form Notices and Claim Form packages to updated addresses for deceased OIBs. *Id*. at ¶ _____. As of the date of this filing, none of these 1,105 re-mailed packages has been returned to CEG. *Id*. at ¶ _____. Thus, while 20,127 packages from the initial mailing remain as "undeliverable as addressed," a total of 34,943 packages from the initial mailing have not been returned as "undeliverable as addressed". *Id*. at ¶ _____. Based on information in the Pembina Database, most of the remaining "undeliverable as addressed" returns involved deceased OIBs, and CEG's efforts regarding those returns are discussed next.

      **b. The Secondary Notice and Claim Form Mailing to Potential Legal Representatives and Potential Heirs**

CEG has undertaken multiple actions to reach the potential Legal Representatives of and potential Heirs to deceased OIBs, who as of the date of this filing, according to the Pembina Database, number 11,795. *Id*. at ¶ _____.[2] CEG compiled updated contact information on the enrolled populations of the CFC Companion Case four Tribal Plaintiffs provided by the Tribes or Interior into a new secondary mailing list; eliminated known deceased OIBs and minors (persons

---

[2] Following Preliminary Approval, the identification of deceased OIBs has been a priority task for the Settlement Administrator. CEG Affidavit at ¶ _____. It is also an on-going task, as reflected by the fact that even since the initial mailing of Notice in this case, as of the date of this filing, CEG has identified an additional 239 OIBs as deceased. *Id*. at ¶ _____. And, CEG has not yet begun to identify and quantify all potential Legal Representatives and potential Heirs for all deceased OIBs, because that task is best addressed during the claim processing stage of Settlement Distribution. Assuming Final Approval of the Settlement Agreement, and the commencement of Settlement Distribution, at the claim processing stage, CEG will begin to focus on Legal Representative and Heir identification and quantification while also continuing its efforts to reach out to individuals who may be potential Legal Representatives and potential Heirs of deceased OIBs.

under the age of 18 years) from the secondary mailing list; and also removed the potential Legal Representatives of and potential Heirs to deceased OIBs for whom CEG already had good contact information. *Id*. at ¶ ____.

      CEG worked with the global information company, TransUnion, to obtain the names and addresses of 19,392 relatives who may be potential Legal Representatives of or Heirs to 6,365 deceased OIBs. *Id*. at ¶ ____. CEG added these to the secondary mailing list. *Id*. at ¶ ____. Other methods and resources CEG uses to identify and locate potential Legal Representatives of and potential Heirs to deceased OIBs include USPS, credit bureau records, and communications with Settlement Class Members. *Id*. at ¶ ____. And, with this Court's approval, CEG will be working with the Claims Administrator in *Cobell sub nom. Maulson, et al. v. Haaland, et al.,* No. 96-1285 (D.D.C.) (*Maulson*), to research and determine whether any of the deceased Settlement Class Members in this case are also deceased Class Members in *Maulson* and, if there are any such individuals, whether the *Maulson* Claims Administration firm can share any documentation or information regarding the deceased Class Members in *Maulson* with CEG that would help CEG identify potential Legal Representatives of or Heirs to deceased OIBs. ECF No. 28.

      On or about May 10, 2021, using the secondary mailing list, CEG began a secondary mailing, by USPS first-class mail, postage prepaid, of Long-Form Notices and Claim Forms. CEG Affidavit at ¶ ____. The secondary mailing consisted of a total of 40,510 packages, to 40,308 potential Legal Representatives of or potential Heirs to deceased OIBs. *Id*. at ¶ ____. As of the date of this filing, 9,435 of these packages have been returned by USPS to CEG as "undeliverable as addressed". *Id*. at ¶ ____. CEG has re-mailed about 70 of these packages to forwarding addresses provided by USPS, and CEG continues to seek updated addresses. *Id*. at ¶

____.  Importantly, as of the date of this filing, 31,075 packages from the secondary mailing have not been returned as "undeliverable as addressed".  *Id*. at ¶ ____.

### 4.  Media Notice

Pursuant to the Settlement Agreement and the Order, on March 1, 2021, CEG began coordinating a comprehensive, efficient, and effective targeted media notice program spanning across national, regional, and tribal outlets consisting of the following components:  paid media; earned media; digital and print media; radio; and social media.  *Id*. at ¶ ____.

The paid media program was implemented through national, local and tribal newspapers, online sites and digital and social media, and consisted of ad units that ranged from half-page to full-page sizes. *Id*. at ¶ ____. The paid print media campaign included the publication of the approved Summary Notice, attached to CEG's Affidavit as Exhibit__, in a leading national publication as well as regional mainstream newsprints and Native American and tribal periodicals and newspapers. *Id*. at ¶ ____. In total, the Summary Notice appeared in approximately 1,955,545 printed copies of the following 12 newspapers and periodicals with a combined readership of about 4.8 million:  *Havre Daily News*; *Montana Standard*; *Anishinaabeg Today*; *The Circle; Great Falls Tribune; Grand Forks Herald; Fargo Forum; Turtle Mountain Times; Turtle Mountain Star; Billings Gazette; Char-Koosta News;* and *USA Today.  Id*. at ¶ ____.  Summary Notice also was published in the form of a press release via PR Newswire and distributed to over 20,000 journalists and media outlets nationwide resulting in 78 pickup matches (*i.e*., writings by journalists or editors based on the press release), with a potential audience of 155,904,635 visitors. *Id*. at ¶ ____.

Paid digital media, which includes the display of online banners, appeared on two major Native American websites, IndianCountryToday.com, and Indianz.com. *Id*. at ¶ ____.  In total,

digital paid media banner displays generated 255,222 impressions and 261 direct clicks on the links embedded in the banners that redirected visitors to the Pembina Settlement Website. *Id*. at ¶ ____. For paid social media, CEG utilized Settlement Class data to match social media users for targeting across social media platforms in such a manner that the digital banners were seen only by individuals in the Settlement Class. *Id*. at ¶ ____. The paid social media program served digital banners across different platforms, such as mobile and desktop web, Facebook, and Instagram. *Id*. at ¶ ____.

With respect to earned media, CEG arranged for 30 national, regional, and local media articles and radio interviews about the Class Action Settlement Agreement, many of which were based on telephone interviews between the media outlets, Class Counsel and the lead appointed Class Representative, Leslie Ann Wilkie Peltier. *Id*. at ¶ ____. Earned media articles appeared in the following 27 newspapers and online media outlets: *Grand Forks Herald; Havre Daily News; Anishinaabeg Today; Fargo Forum; Billings Gazette*; *Missoulian*; *Hi-Line Today; Duluth News Tribune*; *National Trial Lawyers*; *Perham Focus; Bemidji Pioneer; Brainerd Dispatch*; *Dickinson Press*; *Alexandria Echo Press; Jamestown Sun; Park Rapids Enterprise; Post Bulletin; West Central Tribune*; Law360; classAction.org; Top Class Actions; Yahoo! Money; KPVI News 6; Whiteearth.com; *Class Actions Reporter;* DL-Online; and FindLaw. *Id*. at ¶ ____. CEG initiated and set up two live radio interviews with regional and local radio stations, including one owned and operated by CFC Companion Case Tribal Plaintiff Chippewa Cree Tribe, and an independent radio station located in Havre, Montana. These interviews were conducted with Class Counsel and aired on the following radio stations: Montana Radio Company: Coffee Break program on April 7, 2021; and KOJM / KPQX / KRYK: Morning news on March 22, 2021. *Id*. at ¶ ____. Finally, CEG arranged for the recording and broadcast of a

pre-recorded public service announcement by Class Counsel providing information about the Class Action Settlement Agreement on the National Public Radio member station located in Belcourt, North Dakota on the Turtle Mountain Band's Reservation. The public announcement service aired daily from March 29, 2021 through April 29, 2021. *Id*. at ¶ ____.

With respect to social media, CEG created, and is maintaining and monitoring, a Facebook page dedicated to the Pembina Class Action Settlement. *Id*. at ¶ ____. The Pembina Class Action Settlement Facebook page includes various settlement related updates, a link to the Settlement Website and the option to contact the Settlement Administrator via Facebook Messenger with any questions. *Id*. at ¶ ____. As of the date of this filing, the Pembina Class Action Settlement Facebook page has had a reach of 3,887. *Id*. at ¶ ____. [3]

As CEG explains, the two basic criteria used to measure class action media notice effectiveness and adequacy for the targeted class are reach and frequency. *Id*. at ¶ ____. Reach is the estimated percentage of a targeted audience reached one or more times by a media notice program. *Id*. at ¶ ____. Frequency is the estimated average number of opportunities the class members have seen information about a settlement. *Id*. at ¶ ____. Based on industry standards of calculating reach and frequency, CEG estimates that the combined effect of the media notice and direct notice program components in this case reached about 95% of the Settlement Class with an average frequency of 10.2 times reaching over 2.49 million people across all platforms, and an estimated 25.4 million overall impressions.  *Id*. at ¶ ____.

**5.  Exclusions and Objections**

---

[3] In addition to the Pembina Class Action Settlement Facebook page, multiple independent Facebook pages and groups actively have been reposting and sharing information and articles related to the Settlement, as well as contact information for individuals to communicate with CEG.  *Id*. at ¶ ____. As of the date of this filing, approximately fifteen Facebook groups and/or pages have initiated Settlement related posts. *Id*. at ¶ ____.

The deadline for individuals in the Settlement Class to postmark their Exclusions / Opt-outs from the Settlement Class was April 29, 2021. Order at ¶ 9.a. CEG received four timely postmarked Exclude / Opt-out requests from individuals in the Settlement Class. *Id*. at ¶ ____. After CEG contacted these individuals directly in accordance with the Settlement Agreement provisions for retraction, all four requests to Exclude / Opt-out were retracted. *Id*. at ¶ ____. On June 3, 2021, CEG received an untimely Exclude / Opt-out request from an individual who does not appear to be in the Settlement Class. *Id*. at ¶ ____. Thus, as of the date of this filing, CEG has received no standing Exclusions / Opt-outs from individuals in the Settlement Class. *Id*. at ¶ ____.

The deadline for individuals in the Settlement Class to postmark their Objections to the fairness of the Settlement Agreement was April 29, 2021. Order at ¶ 9.b. As of the date of this filing, CEG has received 17 Objections. *Id*. at ¶ ____, copies of which are attached to CEG's Affidavit as Exhibit __. These Objections include nine timely postmarked Objections from OIBs; four timely postmarked Objections from individuals who do not appear to be in the Settlement Class; one timely Objection from a potential Heir to a deceased OIB; two untimely Objections from OIBs; and one untimely Objection from a potential Heir to a deceased OIB. *Id*. at ¶ ____.[4]

### 6. Claim Forms

As of the date of this filing, CEG has received ____ Claim Forms and devoted considerable time and resources to assisting Settlement Class Members, primarily elders, with their completion and submission of Claim Forms. *Id*. at ¶ ____. Of course, CEG will not begin to

---

[4] Three Objectors also stated a request to be Excluded / Opted-out from the Settlement Class. CEG immediately sent written correspondence to these Objectors in an effort to clarify their status (*e.g.,* Opt-out or Objector). ECF No. 28. More recently, CEG has sent written correspondence notifying the Objectors of information about the Fairness Hearing. To date CEG has not heard further from these individuals.

process any Claim Forms, unless and until the Court grants Final Approval of the Class Action Settlement Agreement. Further to this point, the Order (¶ 10) requires Claim Forms by Settlement Class Members to be mailed to CEG and postmarked by September 8, 2021. However, for purposes of Plaintiffs' Motion for Final Class Certification and Final Approval of the Class Action Settlement Agreement, in light of the large number of deceased OIBs, it is significant that a considerable number of Claim Forms already have been submitted.

### G.  Proposed Final Allocation and Anticipated Distribution of Settlement Proceeds

The Settlement Agreement preliminarily allocated the total amount of Settlement Proceeds to be paid by Defendants -- $59 million -- as follows:  The total amount preliminarily allocated for Settlement Class Members was $40,987,112.00, which consisted of $1,063,400.00 for 21,268 Settlement Class Members who shared in the 1964 Award; $33,748,992.00 for 29,296 Settlement Class Members who shared in the 1980 Award as members of a Tribal beneficiary; and $6,174,720.00 for 4,288 Settlement Class Members who shared in the 1980 Award as members of the NMLDs group.  Settlement Agreement at § II.L.1. These preliminary allocations in turn resulted in the following estimated minimum Settlement Proceeds payments:  $50.00 for each of the 21,268 Settlement Class Members who shared in the 1964 Award ($1,063,400.00 ÷ 21,268 = $50.00); $1,152.00 for each of the 29,296 Settlement Class Members who shared in the 1980 Award as a member of a Tribal beneficiary ($33,748,992.00 ÷ 29,296 = $1,152.00); and $1,440.00 for each of the 4,288 Settlement Class Members who shared in the 1980 Award as a member of the NMLDs group ($6,174,720.00 ÷ 4,288 = $1,440.00). The total amount preliminarily allocated for the CFC Companion Case Tribal Plaintiffs was $8,437,376.00, which consisted of $987,047.11 for the Chippewa Cree Tribe; $6,580,723.39 for the Turtle Mountain

Band; $541,550.27 for the Little Shell Tribe; and $328,055.23 for the White Earth Band. *Id.* at § II.L.2.

The **proposed final allocation of the Settlement Proceeds** increases the total amount allocated for the PJF beneficiaries – Tribal and Individual -- of the 1980 Award, but not the 1964 Award, by $2 million. The increased allocation for the 1980 Award beneficiaries is derived solely from a reduction in the amount allocated for Class Counsel Fees, Expenses and Costs.

Under the proposed final allocation, the total amount allocated for Settlement Class Members increases from $40,987,112.00 to $42,186,265.00. The specific components of this allocation are as follows:

a.      The total amount allocated for the 21, 268 Settlement Class Members who shared in the 1964 Award remains $1,063,400.00.

b.      The total amount allocated for the 29,296 Settlement Class Members who shared in the 1980 Award as members of a Tribal Beneficiary increases from $33,748,992.00 to $35,155,200.00.

c.      The total amount allocated for the 4,288 Settlement Class Members who shared in the 1980 Award as members of the NMLD group increases from $6,174,720.00 to $6,432,000.00.

These proposed final allocations in turn will allow for the following Settlement Proceeds payments:  $50.00 for each of the 21, 268 Settlement Class Members who shared in the 1964 Award ($1,063,400.00 ÷ 21,268 = $50.00); $1,200.00 for each of the 29,296 Settlement Class Members who shared in the 1980 Award as a member of a Tribal beneficiary ($35,155,200.00 ÷ 29,296 = $1,200.00); and $1,500.00 for each of the 4,288 Settlement Class Members who shared in the 1980 Award as a member of the NMLDs group ($6,432,000.00 ÷ 4,288 = $1,500.00).

With respect to the allocations to the Tribal Plaintiffs in the CFC Companion case, under the proposed final allocation, the total amount preliminarily allocated to them increases from $8,437,376.00 to $8,786,920.00.  The specific components of the proposed final allocation are as follows:

a.      the total amount allocated to the Chippewa Cree Tribe increases from $987,047.11 to $1,027,939.00;

b.      the total amount allocated to the Turtle Mountain Band increases from $6,580,723.39 to $6,853,350.00;

c.      the total amount allocated to the Little Shell Band increases from $541,550.27 to $563,986.00; and

d.      the total amount allocated to the White Earth Band increases from $328,055.23 to $341,646.00.  *See* Settlement Agreement, at § II.L.2.

The proposed final total amount allocated for Class Representative Service Awards remains $170,000.00 ($2,000 for each of the 85 Class Representatives or Named Representatives who are serving or have served in this action or in the CFC Companion Case, as set forth in Exhibit C to this Memorandum). *Id*. at § II.L.3 The proposed final total amount allocated for Class Counsel Fees, Expenses and Costs is reduced from the proposed preliminary allocation of $6,405,512.00 to $5,400,000.00.  *Id.* at § II.L.4. The proposed final total amount allocated for the Settlement Administrator's Fees, Expenses and Costs is reduced to $2,000,000.00. This reduction takes into account that during the Preliminary Approval stage, per the Settlement Agreement, Class Counsel has paid or likely will pay CEG $971,520.33 under contract upon receipt of the required monthly invoices detailing Notice costs. Settlement Agreement at §§ II.M.5 and II.M.6. Upon Final Approval, the Settlement Administrator will be paid out of the

21

Settlement Proceeds in an amount not more than the remaining $2 million of the total $3 million amount allocated for Settlement Administration. *Id*. at § II.L.5.

If Final Approval is granted to the Class Action Settlement Agreement, the anticipated Settlement Distribution is set forth in the Settlement Agreement. Within five days from the transfer of funds into the Qualified Settlement Fund. Settlement Agreement, CEG will begin transmitting Settlement Distribution payments to living OIBs for whom CEG has good contact information. *Id*. at §§ II.M.1 and II.M.2.a. CEG also will make payments to the CFC Companion Case Tribal Plaintiffs, the Class Representatives for their Service Awards, and to Class Counsel for Class Counsel Fees, Expenses and Costs. *Id.* at § II.M.2.b.

With Final Approval, CEG will begin processing Claim Forms, and, within 30 days from the transfer of funds into the Qualified Settlement Fund, CEG will begin transmitting Settlement Distribution payments to Known Legal Representatives of Settlement Class Members and Eligible Heirs who have timely submitted complete and valid Claim Forms. *Id*. at §§ II.M.2.c and II.M.2.d.1. Deficient Claim Forms may be cured. *Id*. at § II.M.2.c.5. Claim Form completeness and validity determinations will be made in the first instance by CEG, in the second instance by Class Counsel, and in the third instance by the Court. *Id.* at §§ II.M.2.c.3, II.M.2.c.6, and II.M.2.c.7. Only one Legal Representative of a Settlement Class Member or one Eligible Heir of a Deceased Settlement Class Member is entitled to a Settlement Distribution payment. *Id.* at § II.M.2.d.2. If a Deceased Settlement Class Member has no Legal Representative or Eligible Heirs, CEG must distribute the Settlement Distribution payment due to that Deceased Settlement Class Member to the CFC Companion Case Tribal Plaintiffs. *Id.* at § II.M.2.d.4.

CEG may reissue returned or lost Settlement Distribution payments. *Id*. at § II.M.3. The Settlement Distribution period ends 370 days after the deposit of Settlement Proceeds in the Escrow Account. *Id*. at § II.A.66. At that time, any undistributed Settlement Proceeds escheat to the CFC Companion Case Tribal Plaintiffs. *Id*. at § II.M.4.

## II.    FINAL CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS IS APPROPRIATE

This Court exercised its broad discretion in granting conditional certification to the proposed class for settlement purposes only in this action. *See Hartman v. Duffey,* 19 F.3d 1459, 1471 (D.C. Cir. 1994). Even where, as here, the motion for class certification was unopposed, the Court reviewed the certification standards to determine whether Plaintiffs had met their burden under Rule 23, *In re APA Assessment Fee Litig*., 311 F.R.D. 8, 14 (D.D.C. 2015), of showing both Rule 23(a)'s four requirements of numerosity, commonality, typicality, and adequacy of representation, and Rule 23(b)'s requirements of predominance and superiority. *Rogers v. Lumina Solar, Inc.*, No. 18-CV-2128 (KBJ), 2020 WL 3402360, at * 3 (D.D.C. June 19, 2020); Order at ¶ 2; *see also* Transcript of Hearing Conducted on February 12, 2021. Close judicial scrutiny was particularly appropriate since conditional class certification and preliminary approval of a class action settlement agreement were sought simultaneously. *In re APA Assessment Fee Litig*., 311 F.R.D. at 13.

### A.  Rule 23(a) and 23(b) Certification Standards Remain Satisfied

Since conditional certification, nothing has changed to alter the propriety of class certification in this action at least for settlement purposes only in terms of numerosity, commonality, typicality, adequacy of representation, predominance and superiority. *See Stephens v. Farmers Rest. Grp.*, No. CV 17-1087 (TJK), 2019 WL 2550674, at *3 (D.D.C. June 20, 2019) (in considering final certification, noting that class certification standards remain satisfied from

when conditional certification was granted). Accordingly, final certification is now appropriate. *Prince v. Aramark Corp.*, 257 F. Supp. 3d 20, 24 (D.D.C. 2017) ("Nothing material has changed since [Preliminary Approval] that would lead the Court to conclude that [final] class certification is not warranted").

The definition of the Settlement Class remains unchanged, and it remains well-founded. The OIBs, of course, already were defined by law, *i.e.*, the 1971 Distribution Act and the 1982 Distribution Act, and by Interior's eligibility determinations made pursuant to those Acts and their implementing regulations. *Chippewa Cree Tribe,* 69 Fed. Cl. at 670. Further, the CFC Companion Case Court expressly held that the 28 U.S.C. § 1505 Identifiable Group of plaintiffs there included "the beneficiaries of the 1964 and 1980 Awards, as defined in the 1971 and 1982 Distribution Acts, including their heirs, descendants, and successors-in-interest." *Id*. at 673.

What has developed since conditional certification is more detailed information about the Settlement Class. As discussed, *supra*, CEG has determined that the population of unique OIBs in the Settlement Class is 39,003. This is the result of combining the populations of the 1964 Award Settlement Class OIBs (21,268 individuals) and the 1980 Award Settlement Class OIBs (33,584 individuals), and eliminating the overlap in individuals between the two Award populations, since some individuals were determined by Interior to be eligible to share in both Awards. Further, as of the date of this filing, CEG has determined that of the 39,003 unique OIBs, 11,795 (about 30%) are deceased. Since there have been no Exclusions / Opt-outs, that also means that 27,208 Settlement Class Members are living at this time.

**B. Rule 23(c)(2) and Due Process Notice Requirements Have Been Satisfied**

Because certification here is sought under Rule 23(b)(3), the notice requirements of Rule 23(c)(2) and Due Process must be satisfied. *Rogers*, 2020 WL 3402360, at *3. Rule 23(c)(2)

requires that notice must be "the best …practicable under the circumstances, including individual notice to all members who can be identified through reasonable efforts." Fed. R. Civ. P. 23(c)(2). "The Due Process Clause also gives unnamed class members the right to notice of a class action settlement but does not require actual notice to all class members who may be bound by the litigation." *In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64, 68 (D.D.C. 2018). Rather, "[n]otice need only be reasonably calculated to reach" the members of the class in order to satisfy the constitutional due process requirements." *Id.*

In approving Plaintiffs' Long-Form and Summary Notices, this Court determined that "[t]he content of these Notices, as well as the program, plans, timelines, and processes (including those for Long-Form Notice, Summary Notice, and Other Notice), that are set forth in the Class Action Settlement Agreement and that include the mailing of direct notice and the establishment of a Settlement Administration Information Website and a Settlement Administration Information Telephone Line that have been or will be created or established and maintained by the Settlement Administrator, meet the requirements of Fed. R. Civ. P. 23(c) and (e) and of due process; they constitute the best notice practicable under the circumstances; and they constitute due and sufficient notice to all persons entitled to such notice." Order at ¶ 6. Likewise, the execution of the approved Notice program, conducted in accordance with the Settlement Agreement terms and the Order, has met Rule 23(c) and due process requirements.

CEG has mailed Notice packages timely and directly to tens of thousands of individuals in or potentially in the Settlement Class, often to multiple addresses that CEG has obtained from multiple sources. For packages returned as "undeliverable as addressed", CEG performs address updates and re-mails the packages to any and all updated addresses. CEG has made and is making extensive efforts to identify and reach relatives of deceased Settlement Class Members,

including using tribal, federal (Interior and USPS), and multiple private sources of information, as well as communications with Settlement Class Members.

CEG's Media Notice program has been comprehensive and effective. Paid media advertisements consisting primarily of the approved Summary Notice ran in multiple national, regional, local and tribal newspapers and periodicals, and a press release of the Summary Notice also was distributed nationwide. Paid digital media included online banners displayed on major Native American websites. Paid social media displayed the digital banners only to individuals in the Settlement Class on various platforms including Facebook and Instagram.

CEG's earned media program included articles in over 30 national, regional, and local media publications, as well as two radio interviews and one radio public service announcement by stations in the heart of the Settlement Class Members' geographic areas.  Social media consists primarily of a very-widely used dedicated Facebook page for the Class Action Settlement Agreement.

CEG has established and maintained a dedicated Telephone Line, Website, and Email address for this case. The Telephone Line is automated, but allows for voicemails and for calls to be returned by a live agent.  The Telephone Line and the Website provide information about or access to updating Settlement Class Member contact information, the Settlement Agreement, Notices and Claim Form, Claim Form submission, important deadlines, and the Fairness Hearing. All of these dedicated tools have been heavily used by Settlement Class Members to date.

CEG's efforts have met or gone beyond the Rule 23 and due process class action notice requirements. CEG estimates that the overall Notice program in this case reached 95% of potential individuals in the Settlement Class. In other words, the Notice program has been very

successful. *See In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 15 (D.D.C. 2019), *appeal dismissed*, No. 19-7058, 2019 WL 3955818 (D.C. Cir. July 30, 2019) (estimating direct notice combined with paid media to have reached 72.3% of potential class members). By any standard, the Notice program here has been thorough, the best practicable under the circumstances, and reasonably calculated to reach class members. *Rogers*, 2020 WL 3402360, at *8.

The certification standards and notice requirements having been met, final certification of the proposed class for settlement purposes only is appropriate, as is final designation of the proposed named plaintiffs as Class Representatives and NARF as Class Counsel for the purpose of Final Approval of the Class Action Settlement Agreement.

## III.  THE COURT SHOULD GRANT FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT AGREEMENT

### A.  The Standard for Final Approval Has Five Factors

"Parties to a class action cannot enter into a binding settlement agreement without court approval." *Stephens v. Farmers Rest. Grp.*, No. CV 17-1087 (TJK), 2019 WL 2550674, at *3 (citations omitted). "Whether to approve a proposed settlement agreement is ultimately within the discretion of the reviewing court." *Id*. (citation omitted). "But that discretion 'is constrained by the "principle of preference" favoring and encouraging settlement in appropriate cases.'" *Id*. (citations omitted). "Indeed, in this Circuit, '[s]ettlement is highly favored, as [n]ot only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation.'" *Id*. (citations omitted).

Exercising its discretion, this Court already has determined that Plaintiffs have met their burden, *Richardson v. L'Oréal USA, Inc.,* 991 F. Supp. 2d 181, 203 (D.D.C. 2013), of proving, on the facts and circumstances of this case, *Equal Rts. Ctr. v. Washington Metro. Area Transit*

*Auth.*, 573 F. Supp. 2d. 205, 211 (D.D.C. 2008), the Class Action Settlement Agreement's fairness, adequacy, and reasonableness under Rule 23(e), *Ross v. Lockheed Martin Corp.,* 267 F. Supp. 3d 174, 194 (D.D.C. 2017), at least for purposes of Preliminary Approval. Order at ¶ 5. The standard for preliminary approval is less demanding than the standard for final approval, *Ross,* 267 F. Supp. 3d at 194, but there is some overlap, and in any event the unique post-preliminary approval matters must be addressed at a fairness hearing which is required for final approval. *Abraha v. Colonial Parking, Inc*., No. CV 16-680 (CKK), 2020 WL 4432250, at *10 (D.D.C. July 20, 2020).

The five factors used in this Circuit for final approval of class action settlement agreements are: (1) whether the settlement is the result of arm's-length negotiations; (2) the terms of the settlement in relation to the strength of the plaintiffs' case; (3) the stage of the litigation proceedings at the time of settlement; (4) the reaction of the class; and (5) the opinion of experienced counsel. *Rogers*, 2020 WL 3402360, at *8 (citation omitted). "In analyzing these factors, the Court's role is a limited one:

> It is well-established that courts assume a limited role when reviewing a proposed class action settlement. They should not substitute their judgment for that of counsel who negotiated the settlement. Rather, courts favor the resolution of disputes through voluntary compromise, and, therefore, strongly encourage settlements. In the context of class actions, settlement is particularly appropriate given the litigation expenses and judicial resources required in many such suits. Absent evidence of fraud or collusion, such settlements are not to be trifled with."

*Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 34 (D.D.C. 2018), *appeal dismissed*, No. 18-7071, 2018 WL 4600770 (D.C. Cir. Sept. 11, 2018) (citation omitted).

## B.  The Five Factors Are Satisfied Here

### 1.  The Settlement is the Result of Arm's-Length Negotiations

"Courts generally find that '[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Rogers,* 2020 WL 3402360, at *9. Class Counsel here have substantial experience in litigating and negotiating claims on behalf of Indian individuals against the government, having helmed or participated in at least two such class actions in this Court, *Covelo Indian Cmty. v. Watt,* 551 F. Supp. 366, 368 (D.D.C. 1982), *aff'd as modified,* (Dec. 21, 1982), *vacated as moot,* No. 83-2377 (D.C. Cir. Feb. 1, 1983), and *Cobell v. Norton,* 407 F. Supp. 2d 140 at 174-76 (D.D.C. 2005). More recently, Lead Class Counsel has represented no fewer than fifty tribes in historical breach of trust cases similar to this one that were resolved by negotiated settlements approved by this Court.  *E.g., Nez Perce Tribe, et al. v. Jewell, et al.,* (D.D.C. filed Dec. 28, 2006) (No. 06-2239); *Sisseton Wahpeton Oyate, et al v. Jewell, et al.,* (D.D.C. filed Apr. 30, 2013) (No. 13-601). Counsel for Defendants, of course, have the experience of all of these cases, and many more.

The settlement of the claims in this case and in the CFC Companion case were negotiated over an 11-year period in the CFC's ADR program, under the guidance and direction of CFC Senior Judge Bruggink, who is very experienced in Indian breach of trust cases against the United States, as the Settlement Judge. FAC ¶s 16-17. Primarily through informal discovery requests, Defendants provided large amounts of data, documentation, and other information about the baseline (*i.e.*, non-investment) accounting transactions of the PJF and Defendants' distributions of the 1964 Award and 1980 Award, which was analyzed and discussed extensively by the parties, their counsel, and their expert consultants.

From April 2008 through April 2014, the Parties held twelve in-person formal negotiation sessions in Washington, DC (April, 2008; June, 2008; October, 2008; February,

2009; June 2009; March, 2010; July, 2011; September 2012; March, 2013; and, April 2014); Montgomery, Alabama (June, 2008); and Bismarck, North Dakota (April, 2013). They conducted numerous other in-person and telephonic discussions, working, and informal negotiations sessions. ADR briefs on specific agreed-upon legal issues were exchanged in April and September 2008. *See Chippewa Cree Tribe*, Joint Status Report (Fed. Cl. filed Apr. 11, 2008) (ECF No. 327); *Id.* at Joint Status Report (Fed. Cl. filed Oct. 28, 2008) (ECF No. 349). Both parties retained expert consultants who conducted multiple damages calculations for settlement negotiation purposes. In April 2009, Judge Bruggink conducted informational meetings about the case with the CFC Companion Case Tribal Plaintiffs and Named Representatives in North Dakota and Montana. *Id.* at Joint Status Report (Fed. Cl. filed July 7, 2009) (ECF No. 370). The CFC Companion Case Tribal Plaintiffs and the Named Representatives otherwise actively participated in the negotiation sessions and worked with Class Counsel and consultants retained by Class Counsel to understand, refine, and resolve the issues surrounding the claims in the case.

In July 2015, after six years of adversarial negotiations in ADR proceedings involving all PJF Plaintiffs' claims – both Tribal and Individual -- the parties reached an agreement in principle on an amount that would constitute the monetary component for the settlement of these claims. *Chippewa Cree Tribe*, Joint Status Report (Fed. Cl. filed Aug. 31, 2015) (ECF No. 479). With respect to Plaintiffs, "all decisions concerning offers, counter-offers, and acceptance and rejection of settlement offers were made by the respective" CFC Companion Case Tribal Plaintiffs and Named Representatives through their counsel. *See In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 388-389 (D.D.C. 2002).

Following the agreement in principle on the proposed settlement's monetary component, the Parties spent nearly three years addressing the settlement's non-monetary components in this unique and complex case involving two ICC Judgment Awards, four PJF Tribal beneficiaries, and tens of thousands of PJF Individual beneficiaries, many of whom are deceased. *Chippewa Cree Tribe*, Joint Status Report (Fed. Cl. filed May 31, 2016) (ECF No. 487); *Id.*, Joint Status Report (Fed. Cl. filed Dec. 19, 2017) (ECF No. 497). The CFC Companion Case Tribal Plaintiffs and Named Representatives provided valuable input into the substantive terms of the proposed Settlement Agreement, including its Notice and Distribution aspects. *Id.*, *see also* Joint Status Report (Fed. Cl. filed May 31, 2017) (ECF No. 494). They and Class Counsel have relied heavily on their expert consultants to help them understand their options and make informed, sound decisions.

Perhaps most importantly, "[t]he [end-product] Settlement Agreement [here] has been reviewed and approved [by Plaintiffs and by Interior, Treasury] and the Department of Justice." *Greenberg v. Colvin*, No. 13-1837 (RMC), 2015 WL 4078042, at *3 (D.D.C. July 1, 2015) (footnote omitted). Given the extensive negotiation history, process, and approval, there should be "no reason to doubt the adversarial, arm's-length nature of these negotiations or to suspect collusion between the parties.' *In re APA Assessment Fee Litig.*, 311 F.R.D. at 19. "[T]here is nothing in the record to suggest any collusion or coercion on the part of the parties." *Rogers*, 2020 WL 3402360, at *9. The Settlement Agreement here is "the product of legitimate negotiation on behalf of both sides." *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 163 (D.D.C. 2014).

## 2. The Terms of the Settlement Are Favorable in Relation to the Strength of the Case

Other than the proposed favorable change in final allocation of the Settlement Proceeds, set forth *supra*, the Settlement Agreement terms have not changed since this Court's Preliminary Approval. The second final approval factor is a comparison of the settlement terms "with the likely recovery plaintiffs would attain if the case proceeded to trial, an exercise which necessarily involves evaluating the strengths and weaknesses of plaintiffs' case." *Rogers*, 2020 WL 3402360, at *9 (citations omitted). "The D.C. Circuit has suggested that this may be the most important factor in evaluating a proposed class settlement." *Id.* (citation omitted).

The comparison of settlements of similar cases is an accepted judicial tool for analyzing this factor. *Trombley v. Nat'l City Bank,* 759 F. Supp. 2d 20, 24-25 (D.D.C. 2011). In 2011, this Court approved the class action settlement agreement in the largest historical breach of trust case ever brought by American Indians and Alaska Natives against the United States government. *Cobell v. Salazar*, No. 1:96CV01285 TFH, 2011 WL 10676927 (D.D.C. July 27, 2011) (Order granting final approval to settlement). The settlement amount in *Cobell* was over $1.5 billion. *Id.* at 2011 WL 10676927, at *4. Further, between 2011 and 2017, this Court approved the settlement agreements of over seventy American Indian and Alaska Native tribes with respect to their historical breach of trust claims against the government. The tribal trust case settlement amounts in this Court ranged from $25,000.00, *e.g.*, *Nez Perce Tribe,* Joint Stipulation of Settlement between Defendants and Plaintiff San Luis Rey Indian Water Authority (D.D.C. filed Nov. 18, 2016) (ECF No. 272), to $188,000,000.00, *Confederated Tribes of the Colville Reservation v. Salazar,* Joint Stipulation of Settlement (D.D.C. filed Apr. 11, 2012) (ECF No. 59) (No. 05-2471). The total amount of the settlement here, $59 million, is *per se* well within the range of amounts set by this selective sample of prior individual Indian and tribal historical-breach-of-trust-claims-against-the-government settlement agreements approved by this Court.

Moreover, "the heart of the settlement is the value afforded to class members." *Radosti v. Envision EMI, LLC.,* 717 F. Supp. 2d 37, 58 (D.D.C. 2010). Over $42.65 million, or over seventy-two percent, of the total settlement amount here is proposed to be allocated for distribution to Settlement Class Members.[5] In all likelihood, $42.65 million is between four percent and thirty percent of what Plaintiffs' "best case recovery" might be were the case to go to trial. Being within that range suffices for purposes of final approval. *In re APA Assessment Fee Litig.,* 311 F.R.D. at 19; *Howard v. Liquidity Servs., Inc.*, No. CV 14-1183 (BAH), 2018 WL 4853898, at *5 (D.D.C. Oct. 5, 2018). Additionally, the Settlement Agreement here provides for fixed minimum cash dollar amounts of recovery. *See Ceccone v. Equifax Info. Servs., LLC*, No. 13-CV-1314 KBJ, 2016 WL 5107202, at *9 (D.D.C. Aug. 29, 2016) (taking into account settlement's "automatic" provisions to class members when considering settlement's worth). Further, "given the relatively small amounts [of recovery] at issue" per individual Settlement Class Member, settlement is preferable to litigation. *Alvarez*, 303 F.R.D. at 164.

Moreover, a settlement's percentage of estimated best case recovery at trial "must be considered in conjunction with the *likelihood* of ideal recovery." *In re APA Assessment Fee Litig.,* 311 F.R.D. at 19 (emphasis in original). "Rule 23 [only] requires a settlement to be 'fair, reasonable, and adequate'—not ideal." *Id.* at 20 (citation omitted). There is inevitably a "risk that Class Members could get less relief [in litigation] than what is contemplated in the Settlement Agreement." *Greenberg v. Colvin*, No. 13-1837 (RMC), 2015 WL 4078042, at *5 (D.D.C. July 1, 2015). Defendants here sought dismissal of all or some of the CFC Companion Case on the grounds that no liability on their part exists, and that Plaintiffs' claims were untimely. *Chippewa*

---

[5] When the amount proposed to be allocated for distribution to the four PJF Tribal beneficiaries (approximately $8.79 million) is added to the $42.65 million allocated for distribution to Settlement Class Members, **the total amount allocated for distribution to all PJF beneficiaries, both Tribal and Individual, is over 87% of the total settlement amount.**

*Cree Tribe*, Defendant's Motion to Dismiss or, in the alternative, for Partial Summary Judgment (Fed. Cl. filed June 6, 2005) (Dkt. #217) "[L]iability cannot be assumed when evaluating a proposed settlement." *Radosti*, 717 F. Supp. 2d at 59.  Further, were litigation to continue, "Defendants would seek to oppose class certification."   *Alvarez*, 303 F.R.D. at 163; *see* Settlement Agreement, at § I.B.4 ("Defendants do not admit or concede any liability or damages, any breach of trust or wrongdoing, and any defenses or arguments against the merits of ***or the appropriateness of class action treatment for the litigation of any claims that the Individual Plaintiffs raise before this Court or any other court***") (emphasis added). "Though the ultimate success of such arguments is uncertain, the Settlement Agreement clearly eliminates any risk posed by such" substantive and procedural arguments. *Greenberg*, 2015 WL 4078042, at *5.

Additionally, the CFC Companion Case Plaintiffs survived dismissal there, but if "this case did not settle and were to proceed to trial, Class Members would have to continue to wait for relief." *Greenberg*, 2015 WL 4078042, at *4. "Such a delay is of particular concern here given the[ir] aging population." *Id.*  About 30% of the OIBs already have passed on during the twenty-nine years since the CFC Companion Case was filed. *See Stephens v. US Airways Grp., Inc.,* 102 F. Supp. 3d 222, 227 (D.D.C. 2015) (in analyzing this factor, taking into account aging population of class members where "approximately 10% of [them had] passed away during the course of litigation"). "This Court cannot discount the possibility of Plaintiffs' receiving more certain and timely distributions through the proposed settlement." *Abraha*, 2020 WL 4432250, at *8. Further, continued litigation of Plaintiffs' claims and Defendants' defenses "likely would [involve] considerable expense on both sides," *Ceccone*, 2016 WL 5107202, at *9, including pretrial discovery and other preparation, expert witnesses, a trial and appeals. "[I]n light of those

costs and risks, a settlement that guarantees a per-[class] member recovery … is fair, reasonable, and adequate." *Id*. at *10.

### 3. The Settlement was Reached at an Appropriate Stage of the Litigation Proceedings

"The third factor requires assessing the status of the litigation at the time of settlement." *Howard*, 2018 WL 4853898, at *6. In assessing this factor, courts typically primarily consider "whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery." *Alvarez*, 303 F.R.D. at 164 (citation omitted).

In the instant case, as noted above, following extensive briefing and decisions on a motion to dismiss, a motion for class certification, and motions for cross-summary judgment in the CFC Companion Case, the parties proceeded in the CFC ADR program. There, the parties engaged in extensive primarily informal discovery of PJF account and distribution data, documents and information, the results of which were analyzed and discussed amongst the parties, their counsel, and their expert consultants. The discovery also provided the basis for the ADR briefs on specific agreed-upon legal issues exchanged and presented to Settlement Judge Bruggink. Finally, the discovery provided the basis for the multiple damages calculations for settlement negotiations' purposes prepared by both parties' expert consultants.

The over-a-decade-long negotiation proceedings in the CFC ADR program guided by Settlement Judge Bruggink, as well as the continual informal discussions between highly experienced counsel, gave counsel and the parties the necessary information to evaluate the strengths and weaknesses of the merits of their respective positions in order to discuss settlement effectively and to make meaningful decisions regarding settlement, the risks of continuing the litigation, and the potential for, and likely amount, of any monetary recovery for the PJF

Plaintiffs' claims. "[T]he relative risks and benefits were fully and fairly assessed," *Rogers*, 2020 WL 3402360, at *10, and "the settlement [here] was reached at an appropriate stage of the litigation." *Kinard v. E. Capitol Family Rental, L.P.*, 331 F.R.D. 206, 216-217 (D.D.C. 2019).

**4.   The Settlement Class Reaction to the Settlement is Favorable**

The reaction of the class as expressed after notice of preliminary approval of a settlement is the fourth factor that must be considered for the settlement's final approval. *Ceccone*, 2016 WL 5107202, at *10 (citation omitted). "A 'low number of opt outs and objectors (or purported objectors) supports the conclusion that the terms of the settlement were viewed favorably by the overwhelming majority of class members.'" *Kinard*, 331 F.R.D. at 217 (citation omitted). "And the 'existence of even a relatively few objections certainly counsel in favor of approval.'" *Id.* (citation omitted). Further, objections may be gauged in terms of their number as compared to the overall size of the class. *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d at 23 (citation omitted).

Overall, the class's reaction to the settlement in this case is quite positive. The approved Notices clearly advised the Settlement Class of their right to Exclude / Opt-out, and CEG has received no standing Exclusions / Opt-outs. CEG Affidavit, at ¶ ___. As of the date of this filing, CEG received four timely postmarked exclusions / opt-outs from OIBs, which subsequently were retracted in accordance with the Settlement Agreement provisions for retraction. *Id.* at ¶ __; Settlement Agreement at ¶ II.F.5.a ("Settlement Class Members who have requested to be Exclusions or Opt-outs shall have a reasonable opportunity to retract their Exclusion / Opt-out requests before the final determination of Minimum Settlement Class Participation and before the Fairness Hearing"). On June 3, 2021, CEG received a request to Exclude / Opt-out from an individual who does not appear to be in the Settlement Class, but who was sent Notice due to

being identified by TransUnion as a potential Heir.  CEG has corresponded with this individual to apprise her of her non-class member status.  CEG Affidavit, at ¶ ___.

In this case, the lack of any Exclusions / Opt-outs is not likely due to either lack of interest on the part of individuals in the Settlement Class or a poor notice program. *See In re APA Assessment Fee Litig*., 311 F.R.D. at 21. "The individual interests here, while too low to make individual litigation practicable, are still [over $1000.00 per individual] – enough to make class members sit up and pay attention." *Id*. And CEG estimates that 95% of the individuals in the Settlement Class were reached through the Notice program.  CEG Affidavit, at ¶ ___.  A 100% acceptance rate in term of no exclusions or opt-outs unambiguously weighs in favor of final approval.  *See Ceccone*, 2016 WL 5107202, at *10.

The approved Notices also clearly advised the Settlement Class of their right to Object to the terms of the Settlement Agreement. As of the date of this filing, CEG has received seventeen Objections or purported Objections. CEG Affidavit, at ¶ ___; *see also* Exhibit C to this Memorandum.[6] At the outset, three of these Objections were untimely, and four timely ones were made by individuals who appear to lack standing to Object. *Id*. at ¶ ___. The Objections of OIBs Ken Benedict Delorme and Dorsey Belgarde were untimely. *Id*. at ¶s ___ and ___. The Objection of Yancey Thomas, a potential Heir to a deceased OIB, was untimely. Kay Oaklyn Delorme, David Westyn Delorme, Rose McKenna Delorme, and Louis Wylee Delorme made timely Objections, but do not appear to be in the Settlement Class. *Id*. at ¶s ___ and ___. *See In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp.3 d 94, 106 (D.D.C. 2013), *appeal dismissed*, No. 14-7007, 2014 WL 1378762 (D.C. Cir. Apr. 3, 2014) (non-class members lack standing to object).

_____

[6] In the Objections compiled, CEG has redacted all dates of birth, social security numbers, and other sensitive information provided by the Objectors.

The timely Objections by Settlement Class Members are either deficient or lack merit as objections to the Settlement Agreement.  The Objections of OIBs Glen D. Delorme Sr., Leo E. Delorme Sr., Ronald Delorme Sr., Jeffrey M. Delorme, Mark D. Delorme, Marty Dale Delorme, Stacey A. Delorme, and Waylon Louis Delorme, did not comply with the Objection requirements set forth in the Settlement Agreement and reiterated in the approved Notices, as they did not include the "specific term(s) or conditions of this Class Action Settlement Agreement to which the [objector] Objects." Settlement Agreement at ¶ II.H.3.a.2; *see Trombley*, 826 F. Supp. 2d 179, n.13 (D.D.C. 2011), *appeal dismissed*, No. 12-7001, 2012 WL 556319 (D.C. Cir. Feb. 13, 2012); *see also In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F.Supp.3d at n.12. These eight Objections, which are identical, state that the objectors are objecting "to **ALL** provisions of the Settlement Agreement with emphasis related to Section I, Relevant Background (and its subsections) and Section II. Settlement Terms and Conditions (1, 2, 3, 4, 5, 6, 7, 39, and 48)." *See e.g.*, Objection of Glen D. Delorme Sr., in Exhibit C-7 (emphasis in original). "Without significant elaboration on their positions, needless to say, such broad statements are of little aid to the Court in determining whether … settlements are fair, adequate, and reasonable. *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. at 378. Accordingly, they should be found not to impede final approval.  *Id.* (dispensing expeditiously with objection stating merely that the individual objects to the settlement agreement).

The timely Objections of OIB Keith Ronald Delorme, and the Objection of potential deceased OIB Heir David Taylor, essentially take issue with the long-ago determinations of the ICC in making the PJF Awards, of Congress in the 1971 Distribution Act and the 1982 Distribution Act, and of Interior in the PFJ distribution eligibility regulations issued pursuant to the Distribution Acts, about the criteria used to determine the beneficiaries of the PJF. These

matters are simply outside the scope of the claims in this case and in the CFC Companion Case, and the terms of the Settlement Agreement. *Trombley*, 826 F. Supp. 2d at n.13. Accordingly, they should be overruled. *Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349, 363 (D.D.C. 2007) (overruling settlement agreement objection that lacks merit).[7]

Moreover, even if all the Objections were timely, were made by individuals with standing, and were meritorious, sixteen Objections out of a class of 39,003 amounts to a less than .0004% objection rate. This minute rate weighs in favor of approval. *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d at 23 (citations omitted). The Objections of a "few individuals … are not a sufficient reason to deny a benefit to the remaining [tens of thousands] of individuals that will receive monetary awards." *Little*, 313 F. Supp.3 d at 38; *see also Radosti*, 717 F. Supp. 2d at 60-61 (15 objectors representing approximately one-tenth of one percent of an entire class is a relatively low rate of objection that weighs in favor of settlement approval).

The Settlement Class here "reacted to the proposed settlement with virtually unqualified support, presenting no substantive objection to it." *Freeport Partners, L.L.C., v. Allbritton*, No. CIV.A. 04-2030 (GK), 2006 WL 627140, at *10 (D.D.C. Mar. 13, 2006). "In light of this high acceptance rate … the reaction of the class weighs heavily in favor of" final approval." *Kinard*, 331. F.R.D. at 217.

---

[7] The Objections of Ken Benedict Delorme, Keith Ronald Delorme, and David Taylor also stated a request to be Excluded / Opted-out from the Settlement Class. CEG immediately sent written correspondence to these Objectors in an effort to clarify their status (*e.g.,* Opt-out or Objector). ECF No. 28. More recently, CEG has sent written correspondence notifying the Objectors of information about the Fairness Hearing. To date CEG has not heard further from these individuals. As stated in the Declaration of Lead Class Counsel Melody L. McCoy, attached hereto as Exhibit F, at ¶ 9, without further information, Plaintiffs are treating these individuals as Objectors, primarily because they all stated an intent to appear at the Fairness Hearing, and Plaintiffs do not want to prevent them from being heard as to their Objections. Further statements, if any, by these individuals regarding their intent to Opt out can be dealt with at the Fairness Hearing.

5. **The Opinion of Class Counsel is that the Settlement is Fair, Adequate, and Reasonable**

"The opinion of experienced counsel 'should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'" *Kinard*, 331 F.R.D. at 217. Class Counsel here are extremely experienced in litigating and settling Indian breach of trust claims against the United States, including cases with such claims which are class actions or have multiple plaintiffs.  Lead Class Counsel has declared that, in her opinion, the settlement is fair, adequate, and reasonable.  Declaration of Melody L. McCoy, attached hereto as Exhibit F.

Further, Plaintiffs' Motion for Final Class Certification and Final Approval of the Class Action Settlement Agreement is unopposed. *See Abraha*, 2020 WL 4432250, at * 9 (construing defendants' counsel's consent to relief sought in motion for preliminary approval of proposed class action settlement which included declaration of class counsel regarding settlement's fairness, reasonableness and adequacy as representation by "[c]ounsel for both parties … that they believe the settlement to be fair, reasonable, and adequate"). Defendants, of course, are federal agencies and officials, and in analyzing this factor the Court may place greater weight on a settlement negotiated by government attorneys committed to protecting the public interest. *In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. at 380. This factor weighs in favor of Final Approval.

C. **Class Counsel's Fees, Expenses, and Costs, and the Class Representative Service Awards Requests Are Reasonable**

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Courts have a duty to ensure that claims for attorney's fees are reasonable." *Cohen v. Chilcott*, 522 F. Supp. 2d. 105, 122 (D.D.C. 2007). A "percentage-of-the-common-fund" or "percentage-

of-the-recovery" or "percentage-of-the-total-value-of-the-settlement" is the preferred method in this Circuit for determining appropriate attorney's fees, "because it is less demanding on the reviewing court than the lodestar method," and it discourages inflation of actual attorney hours and promotes efficiency in litigation. *Rogers*, 2020 WL3402360, at *11 (citation omitted).[8] Fee award percentages typically range from fifteen to forty-five percent. *Id*. (citations omitted).

Included in the Settlement Agreement preliminarily approved by this Court was a preliminary allocation of the Settlement Proceeds. Settlement Agreement at ¶ II.L.  In seeking Final Approval of the Settlement Agreement, Plaintiffs have proposed a final allocation of the Settlement Proceeds as set forth, *supra*.[9] The proposed final allocation seeks Class Counsel Fees, Expenses and Costs in the amount of $5.4 million, which is a reduction from the preliminary allocation of roughly $6.4 million. The $1 million difference is proposed in the final allocation to be allocated to the 1980 Award Tribal and Individual beneficiaries. The Preliminary Approval of the Settlement Agreement included approval of Class Counsel's request for just over 10% of the total Settlement Proceeds amount.  *A fortiori*, Class Counsel's request for less than 10% of the

---

[8] For the Court's information, and consistent with the Memorandum of Points and Authorities in Support of Plaintiffs' Unopposed Motion for Order 1) certifying Plaintiff Class Pursuant to Fed. R. Civ. P. 23(b)(3) for Settlement Purposes only and Appointing Class Representatives and Class Counsel; and 2) Preliminarily Approving Settlement Agreement, Appointing a Settlement Administrator; and Approving Notices and Claim Form, ECF No. 16, attached to this Memorandum as Exhibit C is the actual expenditure report for Class Counsel Attorneys' Fees, and Case Costs Through April 2021 for this Action and the CFC Companion Case.  As that report shows, the actual expenditures as of April 2021 are $6,923,308.75.

[9] The Rule 23(h) requirements for a motion for class action attorney's fees can be met in motions for preliminary or final approval of a class action settlement agreement where the settlement agreement sets forth the attorney's fees, expenses, and costs separate and apart from the monetary compensation to settlement class members. *Alvarez*, 303 F.R.D. at 165 and n.5; *see also Equal Rts. Ctr. v. Washington Metro. Area Transit Auth.*, 573 F. Supp. 2d at 215 (court considers the reasonableness of attorney's fees contemplated by a settlement agreement). The fact that attorney's fees are structured into a settlement agreement, however, does not excuse the Court from examining whether the agreed-upon fees are fair, reasonable, and adequate.  *Alvarez*, 303 F.R.D. at 165 (citation omitted).

total Settlement Proceeds amount should also be approved, as it is well below the range of typical fee award percentages, and neither Defendants nor any "members of the class have objected to any part of this request." *In re APA Assessment Fee Litig*., 311 F.R.D. at 22.

The amount preliminarily approved for Class Representative Service Awards remains the same in the proposed final allocation of Settlement proceeds: $2,000.00 for each of the 85 individuals who are serving or who have served as Class Representatives in this action or as Named Representatives in the CFC Companion case.  *See* Exhibit D to this Memorandum (List of All Present and Past Class and Named Representatives for Individual Plaintiffs in this Action and in the CFC Companion Case).  In this Circuit, awards of this modest level of amount "are a typical feature of class action litigation" routinely approved to compensate named plaintiffs for their time and the services they provided during the course of litigation and settlement negotiations. *Rogers*, 2020 WL 3402360, at \*12. Neither Defendants nor any Settlement Class Members objected to this request, which accordingly should be granted final approval as well. *See Kinard*, 331 F.R.D. at 217.

IV.    **CONCLUSION**

For the reasons set forth above, Plaintiffs' Unopposed Motion for an Order:  1) granting final certification to the Plaintiff Class pursuant to Fed. R. C. P. 23(b)(3) for settlement purposes only, and 2) granting Final Approving the Class Action Settlement Agreement, should be granted.

Dated this 3rd day of June, 2021.

Respectfully submitted,

*/s/ Melody L. McCoy*
MELODY L. MCCOY
CO Bar # 16960, U.S. Dist. Ct. (D.C.) CO0043
KIM JEROME GOTTSCHALK, *pro hac vice*
NM Bar # 3799
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
Tel.: (720) 647-9691 (McCoy)
Tel.: (720) 647-9252 (Gottschalk)
Fax: (303) 443-7776
E-mail: mmccoy@narf.org
Email: jeronimo@narf.org

ATTORNEYS FOR PLAINTIFFS

Case 1:20-cv-03775-TFH   Document 30   Filed 06/03/21   Page 51 of 51

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to LCvR 5.3, I hereby certify that, on June 3, 2021, I electronically transmitted the foregoing document to the Clerk of the Court, using the ECF system for filing and transmittal of a Notice of Electronic Filing to the ECF registrants in this case.


<u>*/s/ Melody L. McCoy*</u>
Melody L. McCoy